1

2

3

4

5

6

7

HONORABLE THOMAS S. ZILLY

8

9

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

| | |
|---|---|
| 11  LEONARD C. LINDSAY and<br>CARL E.W. ZEHNER,<br><br>12          Plaintiffs,<br><br>13     v.<br><br>14  CARNIVAL CORPORATION,<br>CARNIVAL PLC , and HOLLAND<br>15  AMERICA LINE N.V. d/b/a HOLLAND<br>AMERICA LINE N.V. LLC,<br>16<br>17          Defendants. | Case No.  2:20-CV-000982-TSZ<br><br>**SECOND AMENDED CLASS ACTION<br>AND INDIVIDUAL COMPLAINT FOR<br>DAMAGES**<br><br>1.  NEGLIGENCE<br>2.  GROSS NEGLIGENCE<br>3.  NEGLIGENT INFLICTION OF<br>    EMOTIONAL DISTRESS<br>4.  INTENTIONAL INFLICTION OF<br>    EMOTIONAL DISTRESS<br><br>**DEMAND FOR JURY TRIAL** |

18

19

20

### COMPLAINT AND JURY DEMAND

21

Plaintiffs Leonard C. Lindsay and Carl E. W. Zehner bring this action on behalf of

22 themselves and the more than 1,000 passengers who sailed on the cruise aboard the MS

23 ZAANDAM, which boarded on March 7, 2020 and embarked on March 8, 2020, originating in

24 Buenos Aires, Argentina, against Defendants, HOLLAND AMERICA LINE N.V.

25 ("HOLLAND"), its parent companies CARNIVAL CORPORATION and CARNIVAL PLC

26 (collectively, "CARNIVAL") and allege as follows:

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ

-1-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

### THE PARTIES

1.      Individual and representative Plaintiff Leonard C. Lindsay ("Lindsay") is *sui juris*, a resident of Davidson County, Tennessee, and was a passenger on the MS ZAANDAM cruise from March 7, 2020, to disembarkation on or about April 9, 2020.

2.      Individual and representative Plaintiff Carl E.W. Zehner  ("Zehner") is *sui juris*, a resident of Davidson County, Tennessee, and was a passenger on the MS ZAANDAM cruise from March 7, 2020, to disembarkation on or about April 5, 2020.

3.      Defendant CARNIVAL CORPORATION was incorporated in 1972 in Panama and has its headquarters in Miami, Florida.

4.      Defendant CARNIVAL PLC was incorporated in 2000, in Wales, United Kingdom, and has its headquarters in Miami, Florida.

5.      Defendant HOLLAND AMERICA LINE N.V. d/b/a HOLLAND AMERICA LINE N.V. LLC is incorporated in Curaçao, and has its headquarters in Seattle, Washington.

6.      Upon information and belief, at all times hereto, CARNIVAL CORPORATION, CARNIVAL PLC, and HOLLAND AMERICA LINE N.V. advertised, marketed, sold, and profited (directly or indirectly) from and owned, controlled, and operated the cruise ship, MS ZAANDAM.

### ALTER EGO/PIERCING CORPORATE VEIL

7.      Defendants CARNIVAL CORPORATION, CARNIVAL PLC, and HOLLAND AMERICA LINE N.V. are alter egos and/or agents of each other such that the corporate form should be disregarded.

8.      CARNIVAL CORPORATION and CARNIVAL PLC operate as a single economic enterprise. They share a senior executive management team and identical Boards of Directors. Both Carnival Corporation and Carnival plc share a single headquarters in Miami, Florida.

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ

-2-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

9. As described by CARNIVAL CORPORATION in a filing with the Securities and Exchange Commission ("SEC"), "Carnival Corporation and Carnival plc operate a dual listed company ('DLC'), whereby the businesses of Carnival Corporation and Carnival plc are combined through a number of contracts and through provisions in Carnival Corporation's Articles of Incorporation and By-Laws and Carnival plc's Articles of Association." Plaintiffs bring this lawsuit against CARNIVAL CORPORATION and CARNIVAL PLC individually, but because the entities work as alter-egos and/or agents of one another, Plaintiffs refer to them collectively throughout this Complaint as "CARNIVAL."

10. In a 2016 federal criminal plea agreement, CARNIVAL stated that it "currently monitors and supervises environmental, safety, security, and regulatory requirements for" its brands, including HOLLAND. The agreement also explained that "Carnival Corporation & plc operate a total of 101 ships visiting 700 ports around the world, including most major ports in the United States."

11. CARNIVAL has ownership and control over HOLLAND, which is organized under Holland America Group within CARNIVAL. CARNIVAL has claimed in filings with the SEC that it wholly owns HOLLAND as a subsidiary.

12. As described in the same SEC filings, CARNIVAL claims a portfolio of cruise brands which it breaks into two segments: (1) the North America Segment, which includes HOLLAND, and (2) the Europe Australia and Asia Segment. CARNIVAL represents that, with these two segments, it "operate[s] over 100 cruise ships within a portfolio of leading global, regional, and national cruise brands." CARNIVAL further provides details as to passenger capacity of each of its subsidiary brands, and each brand's respective percentage of the total capacity of CARNIVAL. HOLLAND is one of the many subsidiary operating lines that is part of this portfolio.

13. CARNIVAL thus represents to the public that it can properly claim the revenues, income, earnings, assets, carrying capacity employees and vessels operating as HOLLAND.

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ
-3-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN 37201
Tel. 615.313.9000 • Fax 615.313.9965

1    CARNIVAL has described these lines as "entities within the Carnival Corporation and Carnival

2    plc (formerly P&O Princess Cruises plc) corporate umbrella."

3        14.    CARNIVAL, through its wholly-owned subsidiary, owns the MS ZAANDAM.

4        15.    CARNIVAL has ownership and exercises total domination over HOLLAND's

5    business and day-to-day operations, to the extent that HOLLAND manifests no separate

6    corporate interests of its own and functions solely to achieve the purposes of CARNIVAL.

7            a.    CARNIVAL and HOLLAND have overlapping Boards of Directors, many

8    of the same executive officers, and appear to use the same assets, including the vessel that is the

9    subject of this Complaint;

10           b.    CARNIVAL claims control over HOLLAND's operations. For instance,

11   in a 2016 federal criminal plea agreement, CARNIVAL stated that it "currently monitors and

12   supervises environmental, safety, security, and regulatory requirements for" its brands, including

13   HOLLAND. The agreement also explained that "Carnival Corporation & plc operate a total of

14   101 ships visiting 700 ports around the world, including most major ports in the United States."

15           c.    CARNIVAL promulgated Health, Environmental, Safety, and Security

16   (HESS) policies for all of its cruise line brands, including HOLLAND. CARNIVAL's HESS

17   Corporate Policy states that CARNIVAL will "ensure compliance with this [HESS] policy

18   within each of Carnival's Corporate and Operating Line organizations."[1]

19           d.    In 2018, CARNIVAL implemented a HESS event reporting platform to

20   "standardize HESS event reporting and analysis capabilities across our entire fleet."[2]

21           e.    CARNIVAL's Group Senior Vice President and Chief Medical Officer,

22   Dr. Grant Tarling, also serves as the Chief Medical Officer for HOLLAND.

23

24   [1] Carnival Corporation & PLC Health, Environmental, Safety, Security, and Sustainability Corporate Policy,
     https://www.carnivalcorp.com/static-files/0b8327aa-c3be-4022-a1a5-a6dad7123af7 (last visited October 20, 2020).
25   [2] Sustainability from Ship to Shore, Carnival Corp. & PLC FY2018 Sustainability Report,
     https://safety4sea.com/wp-content/uploads/2019/06/Carnival-Corp.-Sustainability-From-Ship-to-Shore-2019_06.pdf
26   (last visited October 10, 2020).

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ                                    -4-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

1           f.       In 2019, CARNIVAL announced that it was creating a new Chief Ethics

2 and Compliance Officer "to further develop our ethics and compliance program across the entire

3 corporation." CARNIVAL explained that "[i]t is important to note that the Ethics & Compliance

4 is not just a single department within All Brands Group – but rather a corporate-wide program –

5 with key Ethics & Compliance Officers . . . who help shape and implement the program

6 initiatives in each of the operating companies."

7           g.      In late March 2020, when the MS ZAANDAM was still seeking a port in

8 which it would be allowed to dock and disembark passengers, as described in more detail below,

9 CARNIVAL's Chief Maritime Officer William Burke met with the Broward County (Florida)

10 Commission to negotiate permission for the MS ZAANDAM to dock in Port Everglades,

11 Florida.[3]

12           h.      In March 2020, CARNIVAL announced that it was implementing a

13 temporary pause of cruise operations across all of its brands, including HOLLAND, as a result of

14 the COVID-19 pandemic. To address the costs of this temporary pause to its operations, the CEO

15 of CARNIVAL wrote a message to all of the employees of CARNIVAL and its subsidiary

16 brands, stating: "I've directed our brand leaders to reduce or eliminate non-critical cash

17 expenditures, but of course never cutting anything that would impact compliant, environmentally

18 sound and safe operations."

19           i.      In July 2020, CARNIVAL announced that it would sell thirteen (13) ships

20 from its fleet, including four from its HOLLAND brand, as a way for CARNIVAL to "emerge

21 stronger, leaner, and more efficient" after the COVID-19 pandemic.[4]

22

23

24 [3] Jonathan Levin, *Carnival Begs for Docks for Virus-Beset Ships After Weeks at Sea*, Bloomberg, March 31, 2020, https://www.bloomberg.com/news/articles/2020-03-31/carnival-begs-for-permission-to-dock-virus-beset-ship-in-

25 florida (last visited October 10, 2020).
[4] *Carnival Corporation to Begin Cruises in Phases*, Reuters, July 10, 2020, https://gcaptain.com/carnival-

26 corporation-to-begin-cruises-in-phases/ (last visited Oct. 20, 2020).

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ

-5-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

1       j.      CARNIVAL also claims for itself all of HOLLAND's purported rights, exemptions from liability, defenses, and immunities included in HOLLAND's Passage Contract, despite not being a signatory to the Passage Contract.

k.      CARNIVAL determines the bonuses paid to executives of its cruise line brands, including HOLLAND, through its Management Incentive Plan. Bonuses paid to executives of CARNIVAL's cruise line brands, including HOLLAND, are determined both by whether the executive's cruise line brand met its "Brand Operating Income Target" and by whether CARNIVAL met its company-wide "Corporation Operating Income Target."

16.     As demonstrated above, CARNIVAL has ownership and control over HOLLAND, and CARNIVAL exerts control and domination over HOLLAND's business and day-to-day operations. Plaintiff believes that further discovery will reveal the full extent of this control.

17.     Given CARNIVAL's control of operations and co-mingling of assets with HOLLAND—both of which can be more fully established through discovery—the corporate form should be disregarded here. Failure to do so would thwart the interests of justice by allowing CARNIVAL to, on one hand, claim the MS ZAANDAM as a part of its holdings, but then, on the other hand, disclaim responsibility for that vessel and the passengers traveling on it.

### JURISDICTION

18.     This Court has Admiralty subject matter jurisdiction pursuant to 28 U.S.C. § 1333 as this case involves a maritime tort. The type of incident and injuries suffered by Plaintiffs and the class had the potential to impact maritime commerce as Plaintiffs and the class suffered harm and Plaintiffs and the class were and continue to be at serious risk of imminent harm as a result of exposure to COVID-19 aboard the cruise ship upon which they were paying passengers.

19.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, codified at 28 USC §1332(d)(2)(A) and (C), because the claims of the proposed Class Members exceed $5,000,000 and because at least one member of the Proposed Class of

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ
-6-
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN 37201
Tel. 615.313.9000 • Fax 615.313.9965

1   plaintiffs is a citizen of a state different from at least one Defendant. Further, this Court has

2   jurisdiction over the individual Plaintiffs under 28 U.S.C. § 1332 because the amount in

3   controversy exceeds seventy-five thousand dollars ($75,000), as to each of the individual

4   Plaintiffs and Plaintiffs are citizens of a different state than the Defendants.

5       20.     This Court has personal jurisdiction over Defendants, who each conduct

6   substantial business in and from within this District.

7       21.     Defendant HOLLAND has its headquarters in Seattle, Washington.

8       22.     Upon information and belief, CARNIVAL, including by and through its

9   subsidiary, HOLLAND, markets cruise vacations to Washington residents and employs

10  thousands of Washington residents to work at its Washington headquarters. The Court has

11  personal jurisdiction over CARNIVAL because CARNIVAL is authorized to do business in

12  Washington, conducts substantial business in Washington and some of the actions giving rise to

13  this Complaint took place in Washington.

14      23.     The claims asserted herein arise from Defendants' contacts with Washington.

15      24.     Additionally, the Cruise Contract purports to name the Western District at Seattle

16  as a proper venue to actions against the Defendants. Although Plaintiffs do not concede the

17  enforceability of the Cruise Contract, by naming this District as a proper venue, Defendants

18  consented to personal jurisdiction in this District.

19      25.     Each of the facts pleaded independently, but also all of these facts together, are

20  sufficient to render the exercise of jurisdiction by this Court over Defendants permissible under

21  traditional notions of fair play and substantial justice.

22                                      **VENUE**

23      26.     Venue in the Western District of Washington is proper under 28 U.S.C. § 1391

24  because Defendants are deemed to reside in any judicial district in which they are subject to

25  personal jurisdiction.

26

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ                    -7-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

27.     Additionally, without conceding the enforceability of the Cruise Contract, the terms of which were not reasonably conveyed to Plaintiffs, Plaintiffs acknowledge the inclusion in the Cruise Contract of a venue selection provision designating the United States District Court for the Western District of Washington at Seattle as a proper venue for this action.

## FACTUAL ALLEGATIONS

### I.      COVID-19, Its Symptoms, and Long-Term Effects

28.     In December 2019, a new strain of Coronavirus known as COVID-19 or SARS-CoV-2 was first reported as having been diagnosed in humans in China. The virus quickly spread through China and Asia and has caused a global pandemic.

29.     On January 20, 2020, the United States Centers for Disease Control and Prevention announced the first confirmed case in the United States. Ten days later on January 30, 2020, the CDC announced that it had identified the first known instance of a person-to-person spread (i.e. not related to travel outside the United States).

30.     Also on January 30, 2020, the World Health Organization declared COVID-19 a "Public Health Emergency of International Concern." According to WHO, a Public Health Emergency of International Concern is "an extraordinary event which is determined to constitute a public health risk to other States through the international spread of disease and to potentially require a coordinated international response."

31.     When Plaintiffs filed their initial Complaint, there were approximately 2.2 million cases in the United States. Now there are over 8 million confirmed cases.  In the meantime many more people in the United States have died as a result of COVID-19 since the filing of the Complaint—bringing the total death toll to nearly 220,000 in the United States. The death toll worldwide is reported to be more than 1 million people out of nearly 41 million confirmed cases.

32.     The full scope of the impact of this pandemic remains unknown, as reports have indicated that the numbers of cases and deaths may be significantly undercounted.[5] One reason

---

[5] Berkeley Lovelace Jr., *Official U.S. coronavirus death toll is 'a substantial undercount' of actual tally, Yale study*

*Footnote continued on next page*

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ

-8-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

for this undercounting is due to the unavailability and inaccuracy of COVID-19 diagnostic tests in the United States, particularly during the early days of the pandemic.[6] Indeed, the initial tests designed by the CDC contained critical flaws, and the process of developing a more accurate test delayed widespread availability of COVID-19 tests by weeks.[7]

33.     Once testing became more widely available—though still not accessible to all those in need—it was, and has remained, inaccurate. In particular, experts warn of false negatives.[8] For instance, one San Francisco resident that contracted COVID-19 during a massive on-ship outbreak on the DIAMOND PRINCESS—which is, like the ship that is the subject of this action, owned by CARNIVAL— reported taking over a dozen COVID-19 tests during a month-long period. The tests returned alternating results of positive and negative.[9]

34.     The concern that negative test results could not be trusted led experts to advise those exposed to COVID-19 to quarantine for 14 days, *even if they tested negative for the virus*.

35.     Despite the likely drastic undercounting of case and death statistics, the numbers make abundantly clear that COVID-19 spreads swiftly, and poses grave risks to individuals exposed to it.

36.     The means by which the virus spreads are varied, and not yet fully known. Studies tend to show that the virus can be transmitted through person-to-person contact,[10] but also

---

*Footnote continued from previous page*

*finds*, CNBC, July 1, 2020, https://www.cnbc.com/2020/07/01/official-us-coronavirus-death-toll-is-a-substantial-undercount-of-actual-tally-new-yale-study-finds.html (last visited August 12, 2020); Apoorva Mandavilli, *Actual Coronavirus Infections Vastly Undercounted, C.D.C. Data Shows*, New York Times, June 27, 2020 (updated August 6, 2020), https://www.nytimes.com/2020/06/27/health/coronavirus.

[6] *See* Olga Khazan, *The 4 Key Reasons the U.S. Is So Behind on Coronavirus Testing*, The Atlantic, March 13, 2020, https://www.theatlantic.com/health/archive/2020/03/why-coronavirus-testing-us-so-delayed/607954/ (last visited August 12, 2020).
[7] Caroline Chen, Marshall Allen, Lexi Churchill, and Isaac Arnsdorf, *Key Missteps at the CDC Have Set Back Its Ability to Detect the Potential Spread of Coronavirus*, ProPublica, February 28, 2020,
[8] Lisa M. Krieger, *Coronavirus false tests results: With a push to screen come questions of accuracy*, The Mercury News, March 19, 2020, https://www.mercurynews.com/2020/03/19/coronavirus-false-test-results-with-the-push-to-screen-come-questions-of-accuracy/ (last visited August 12, 2020).
[9] *Id*.
[10] Centers for Disease Control, How COVID-19 Spreads, Updated June 16, 2020, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited August 12, 2020).

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ

-9-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

through air flow and on surfaces.[11] In particular, recent studies have indicated that spaces without poor or limited ventilation can cause greater accumulation of the airborne virus because of the presence of aerosolized droplets that can cause transmission.[12]

37.     Likewise, the length of time that the virus can survive on surfaces remains unclear. But at least one study indicates that items with repeated and/or prolonged contact—such as a phone or television remote control—can carry the virus. The same study also showed the virus present on surfaces, such as floors and window sills, that were untouched by any patient, but which were in the stream of air flow in the patient's room.[13] Another study suggests that transmission is possible through shared elevator buttons.[14]

38.     The virus has an incubation period believed to be approximately 14 days,[15] but many of the ailments associated with COVID-19 persist for weeks and, in some instances, months.[16]

39.     The full extent and longevity of the virus's effects on the human body also remain unclear and—because of the virus's novelty—largely unstudied. The research that has been conducted suggests that exposure to and contraction of COVID-19 leads to a wide range of

---

[11] *Id.*; *see also* Apoorva Mandavilli, *A Smoking Gun':Infection Coronavirus Retrieved From Hospital Air*, August 11, 2020, https://www.nytimes.com/2020/08/11/health/coronavirus-aerosols-indoors.html (last visited August 12, 2020); Joshua L. Santarpia, et al., *Aerosol and surface contamination of SARS-CoV-2 observed in quarantine and isolation care,* Nature Research Scientific Reports (2020) 10:127732, https://www.nature.com/articles/s41598-020-69286-3.

[12] Apoorva Mandavilli, *A Smoking Gun: Infection Coronavirus Retrieved From Hospital Air*, August 11, 2020, https://www.nytimes.com/2020/08/11/health/coronavirus-aerosols-indoors.html (last visited August 12, 2020)

[13] Joshua L. Santarpia, et al., *Aerosol and surface contamination of SARS-CoV-2 observed in quarantine and isolation care,* Nature Research Scientific Reports (2020) 10:127732, https://www.nature.com/articles/s41598-020-69286-3.

[14] Aylin Woodward, *As asymptomatic coronavirus carrier infected an apartment neighbor without sharing the same space. A study blames the building's elevator buttons.*, Business Insider, July 5, 2020, https://www.businessinsider.com/coronavirus-jumped-between-people-via-elevator-surfaces-study-2020-7 (last visited August 12, 2020).

[15] Centers for Disease Control, Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19), Updated June 30, 2020, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last visited August 12, 2020).

[16] Mark W. Tenforde, et al., *Symptom Duration and Risk Factors for Delayed Return to Usual Health Among Outpatients with COVID-19 in a Multistate Health Care Systems Network –United States, March-June 2020*, Morbidity and Mortality Weekly Report, July 31, 2020, https://www.cdc.gov/mmwr/volumes/69/wr/mm6930e1.htm (last visited August 12, 2020).

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN 37201
Tel. 615.313.9000 • Fax 615.313.9965

medical outcomes, from a mild cough and/or sore throat to sustained cardiac, kidney, liver, neurological, respiratory, and circulatory damage.[17] And, as shown by the statistics reported above, many patients die as a result of contracting the virus.

40.    There is a growing body of research of unseen injuries and long-term harms that face people who showed no symptoms upon having the virus. For example, one recent report suggests that "the evidence has strengthened that cardiac damage can happen even among people who have never displayed symptoms of coronavirus infection."[18]

41.    COVID-19 is sometimes associated with symptoms such as:  fever, cough, shortness of breath, body and muscle aches, and loss of taste and smell. The virus manifests differently, however, in different patients, striking some with brutal swiftness and others with more mild symptoms. Some people who contract the virus have a fever; others do not. Some suffer from extreme fatigue; others do not.[19] Some report having a sore throat; others do not. Some COVID patients never display any of these "typical" symptoms and instead experience COVID-19 as more of a stomach virus, experiencing diarrhea and/or vomiting. Others never experience gastro-intestinal distress. Still, some people test positive for the virus while appearing to be entirely asymptomatic, with no symptoms whatsoever,[20] or only later develop effects from the virus.[21]

42.    In addition to—and sometimes separate from—the symptoms described above, the virus can also wreak havoc on patients' organs. COVID-19 can cause heart[22] and liver

---

[17] Tara Parker-Pope, *The Many Symptoms of Covid-19*, The New York Times, August 5, 2020, https://www.nytimes.com/2020/08/05/well/live/coronavirus-covid-symptoms.html (last visited August 12, 2020).

[18] https://www.scientificamerican.com/article/covid-19-can-wreck-your-heart-even-if-you-havent-had-any-symptoms/ (Aug. 31, 2020)

[19] Centers for Disease Control, Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19), Updated June 30, 2020, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last visited August 12, 2020).

[20] *Id.*

[21] Carolyn Barber, *COVID-19 Can Wreck Your Heart, Even if You Haven't Had Any Symptoms*, Scientific American, August 31, 2020, https://www.scientificamerican.com/article/covid-19-can-wreck-your-heart-even-if-you-havent-had-any-symptoms/ (last visited Sept. 2, 2020).

[22] *Id.*

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ

-11-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

failure, kidney damage, neurological deficits, and blood clots that can lead to severe and/or multiple strokes and limb amputation.[23]

43.     Research thus far has shown that patients who are believed to have "recovered" from COVID-19 continue to suffer life-altering and potentially life-threatening health problems.[24] For instance, one study found that at approximately 71 days after a positive COVID-19 test, irrespective of the severity of the patient's symptoms, the time of the original diagnosis, and any pre-existing conditions, 60% of patients evaluated showed signs of "ongoing myocardial inflammation."[25] The same study discovered that 78% of patients demonstrated "cardiac involvement"—that is, these patients had abnormal cardiac readings associated with bad outcomes for cardiomyopathies.[26]

44.     Additionally, some patients who initially experience only mild symptoms (or no symptoms) later suffer catastrophic damage, such as stroke,[27] severe blood clots,[28] and/or cardiac inflammation like that described above.

45.     And some people contract and carry the virus without manifesting or experiencing any initial symptoms. Researchers have reported that even these "asymptomatic" patients may in fact suffer long-term and/or later-manifesting harms, such as severe cardiac damage including myocarditis and arrhythmias.[29]

---

[23] Lenny Bernstein, Carolyn Y. Johnson, Sarah Kaplan and Laurie McGinley, *Coronavirus destroys lungs. But doctors are finding its damage in kidneys, hearts, and elsewhere*, The Washington Post, April 15, 2020. https://www.washingtonpost.com/health/coronavirus-destroys-lungs-but-doctors-are-finding-its-damage-in-kidneys-hearts-and-elsewhere/2020/04/14/7ff71ee0-7db1-11ea-a3ee-13e1ae0a3571_story.html (last visited April 29, 2020).
[24] *See, e.g.*, Diana Lindner, et al., *Association of Cardiac Infection With SARS-CoV-2 in Confirmed COVID-19 Autoposy Cases*, JAMA Cardiology, July 27, 20202, https://jamanetwork.com/journals/jamacardiology/fullarticle/2768914 (finding "virus progeny" in the heart of autopsied COVID-19 patients).
[25] *Id.*
[26] *Id.*
[27] Ariana Eunjung Cha, Y*oung and middle-aged people, barely sick with covid-19 are dying of strokes*, The Washington Post, April 25, 2020, https://www.washingtonpost.com/2020/04/24/strokes-coronavirus-young-patients/ (last visited August 12, 2020).
[28] Tara Parker-Pope, *The Many Symptoms of Covid-19*, The New York Times, August 5, 2020, https://www.nytimes.com/2020/08/05/well/live/coronavirus-covid-symptoms.html (last visited August 12, 2020).
[29] Carolyn Barner, *COVID-19 Can Wreck Your Heart, Even if You Haven't Had Any Symptoms*, Scientific American, August 31, 2020, https://www.scientificamerican.com/article/covid-19-can-wreck-your-heart-even-if-you-havent-had-any-symptoms (last visited September 30, 2020).

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ

-12-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

46.     Such occurrences were described by Dr. Jon Drezner, Director of the University of Washington Medicine Center for Sports Cardiology in Seattle, team physician for the Seattle Seahawks, Seattle Reign, and University of Washington Huskies, and advisor to the NCAA on cardiac issues, on an August 11, 2020 CNN broadcast.[30] Drezner explained that "early on in the pandemic we learned that COVID-19 can affect the heart. And about one in four hospitalized have heart injury and raised a lot of questions and concerns about patients who weren't in the hospital." He continued by posing the question: "Would patients who have mild symptoms or no symptoms have heart injury?" and further explained that, "[m]ore recently we've been learning that some college and professional athletes are inflicted with myocarditis (inflammation of the heart which can trigger arrhythmia or cardiac arrest) from COVID-19."[31]

47.     Dr. Drezner confirmed that this potentially long-term damage can afflict someone who was asymptomatic or who experienced only a mild case of COVID-19 that did not require hospitalization. He said: "We are learning that some athletes who really had no symptoms and go through subsequent testing are being diagnosed with myocarditis[,]" which is, in his words: "inflammation of the heart muscle and it can lead to scar tissue in the heart.  And that scar tissue can be a focus for arrhythmia or even sudden cardiac arrest."[32]

48.     Likewise, a study that considers, among other things, the lingering impact of the virus on those with mild symptoms is currently underway at the University of California, San Francisco. Among the study's findings, is that children exposed to "adult relatives with flu-like symptoms" developed signs of Kawasaki disease, including lesions on their feet and hands, weeks or months after that exposure.[33]

---

[30] Interview on CNN Anderson Cooper 360 August 11, 2020, transcript available at: http://transcripts.cnn.com/TRANSCRIPTS/2008/11/cnr.10.html
[31] *Id.*
[32] *Id.*
[33] Peter Fimrite, *Long after the illness is gone, damage from coronavirus may remain*, San Francisco Chronicle, May 31, 2020, https://www.sfchronicle.com/health/article/Long-after-the-illness-is-gone-the-damage-from-15305842.php?utm_campaign=CMS%20Sharing%20Tools%20(Premium)&utm_source=share-by-email&utm_medium=email (last visited August 13, 2020)

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ

-13-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

49.     Together, the multiple presentations of the virus, range of severity of symptoms—from asymptomatic to severe—the unavailability and inaccuracy of testing, along with the limited research about COVID-19 make it plausible that a person directly exposed to the virus, particularly for prolonged periods of time, like the passengers on the MS ZAANDAM, will suffer long-lasting, and potentially life-altering or fatal health effects.

50.     As a result and a proximate cause of Defendants HOLLAND and CARNIVAL exposing Plaintiffs to COVID-19 aboard the MS ZAANDAM, as described in more detail below, and because of the nature of the virus and its long-term health effects, Plaintiffs will require medical monitoring and diagnostic examinations into the future. This monitoring is required to diagnose, prevent, and/or treat current or future injury related to Plaintiffs' and Class members' exposure to, contraction of, illness and disease related to, asymptomatic contraction of, and potential contraction of COVID-19, in light of the evolving scientific understanding of the full risk and scope of health outcomes related to and/or resulting from the virus.

II.     **Carnival and Holland Knew or Should Have Known the Risks of Viral Contagion Aboard Their Cruise Ships**

51.     In early February 2020, experts in the European Union, led by epidemiologist Dr. Christou Hadjichristodoulou, released specific guidelines for the cruise industry that included an outline of the risk of COVID-19 outbreaks aboard cruise ships and recommended response protocols.[34] Specifically, the guidelines directed that, in the event of a COVID-19 case, "close contacts" of the case individuals believed to have COVID-19 should be quarantined in their cabin or on shore, and "casual contacts" should be disembarked from the ship.[35]

---

[34] Interim Advice for Preparedness and Response to Cases of Acute Respiratory Disease at Points of Entry in the European Union (EU) / EEA Member States (MS): Advice for ship operators for preparedness and response to the outbreak of 2019-nCoV acute respiratory disease, Feb. 3, 2020, https://www.gac.com/491364/siteassets/about-gac/coronavirus/eu-interim-advice_2019-ncov_maritime_4_2_2020_f.pdf (last visited April 6, 2020); *see also* Matt Apuzzo, Motoko Rich and David Yaffe-Bellany, *Failures on Diamond Princess Shadow Another Cruise Ship Outbreak*, The New York Times, March 8, 2020, https://www.nytimes.com/2020/03/08/world/asia/coronavirus-cruise-ship.html (last visited April 6, 2020).

[35] Healthy GateWays, Algorithm for decision making in response to an event of a suspect case of COVID-19, https://www.nytimes.com/2020/03/08/world/asia/coronavirus-cruise-ship.html (last visited April 6, 2020).

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ                          -14-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

52.     Defendants CARNIVAL and HOLLAND represent to their customers and the general public that they have a commitment to "the health, safety, and security" of their passengers and promote their business as one that "always strives to be free of injuries, illness and loss."[36] They further assert that they "[s]upport a proactive framework of risk mitigation in the areas of HESS [Health, Environment, Safety, Security] aimed at preventing, monitoring and responding to threats."[37]

53.     However, in or before early February 2020, Defendants became aware of an outbreak of COVID-19 aboard the cruise ship the DIAMOND PRINCESS, which is owned and/or operated by CARNIVAL, and its subsidiary Princess Cruise Lines, LTD ("Princess"). Princess shares the same Chief Medical Officer with HOLLAND, Dr. Grant Tarling, M.D., M.P.H.[38]

54.     Dr. Tarling served as a point person and liaison with the public on behalf of CARNIVAL and Princess during and after the COVID-19 outbreak on the DIAMOND PRINCESS.[39]

55.     The outbreak onboard the DIAMOND PRINCESS originated while the vessel was docked in Yokohama, Japan. Ten cases were originally diagnosed, and that number rapidly escalated to over 700 cases—over one-fifth of the passengers and crew members onboard the ship at the time. Investigative reporting about the DIAMOND PRINCESS revealed that well

---

[36] Carnival Health, Environment, Safety, Security & Sustainability Policy & Governance, Carnival Health, Environment, Safety, Security & Sustainability Policy & Governance, https://www.carnivalcorp.com/leading-responsibly/health-environment-safety-security-sustainability-policy-governance/ (last visited Sept. 7, 2020).
[37] Carnival Corporation & PLC Health, Environmental, Safety, Security, and Sustainability Corporate Policy, https://www.carnivalcorp.com/static-files/0b8327aa-c3be-4022-a1a5-a6dad7123af7 (last visited Sept. 7, 2020).
[38] Grant Tarling, M.D. & M.P.H., Holland America, https://www.hollandamerica.com/en_US/news/grant-tarling-biography.html (last visited Sept. 7, 2020).
[39] *See*, *e.g.*, Diamond Princess Update: Dr. Grant Tarling, February 13, 2020, https://www.facebook.com/PrincessCruises/videos/203765767439746/ (last visited August 14, 2020); Dr. Grant Tarling Medical Update with Enhanced Screening and Preventive Health Measures, February 29, 2020, https://www.youtube.com/watch?v=kSOuXwmh9Lo (last visited August 14, 2020).

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ

-15-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

1  after CARNIVAL and Princess became aware of the first case aboard the ship, they worked to

2  "keep the fun going" by "encouraging [guests] to mingle."[40]

3      56.     To date, at least 14 of the DIAMOND PRINCESS's passengers have died as a

4  result of COVID-19.[41] At least seven of these fatalities occurred before March 8, 2020, when the

5  MS ZAANDAM set sail from Buenos Aires.[42]

6      57.     On February 13, 2020, Dr. Grant Tarling posted a "Diamond Princess Update" on

7  Facebook, explaining that six days after learning that a man aboard the ship was diagnosed with

8  COVID-19, "all guests and crew were evaluated for symptoms of the illness and the first batch

9  of several hundred laboratory samples were taken from individuals with symptoms or suspected

10  to have been exposed to the virus."[43] Thus, Defendants were not only aware of the potential for

11  outbreak, but also of steps that should be taken immediately after learning of a positive case

12  onboard.[44]

13      58.     Additionally, Dr. Tarling explained that Japanese health authorities "expected"

14  there would be additional cases onboard the ship due to the exposure passengers and crew

15  members experienced due to contact with the diagnosed individual and his close contacts.[45]

16  Obviously, Defendants knew that even just one positive COVID-19 case onboard one of their

17  cruise ships could expose and infect dozens or more other passengers, leading to an outbreak.

18      59.     What's more, Dr. Tarling's Facebook post identified the symptoms the medical

19  staff onboard the ship were witnessing from those with COVID-19.[46] Thus, CARNIVAL and

---

[40] Austin Carr and Chris Palmieri, *Socially Distance This: Carnival Executives Knew They Had a Virus Problem, But Kept the Party Going*, Bloomberg, April 16, 2020,  https://www.bloomberg.com/features/2020-carnival-cruise-coronavirus/ (last visited April 20, 2020).

[41] Lauren Smiley, *27 Days in Tokyo Bay: What Happened on the Diamond Princess*, Wired, May 13, 2020, https://www.wired.com/story/diamond-princess-coronavirus-covid-19-tokyo-bay/.

[42] Timothy Russell, *et al.*, *Estimating the infection and case fatality ratio for COVID-19 using age-adjusted data from the outbreak on the Diamond Princess cruise ship*, CMMID Repository (March 5, 2020), *https://cmmid.github.io/topics/covid19/diamond_cruise_cfr_estimates.html* (last visited Oct. 21, 2020).

[43] Diamond Princess Update: Dr. Grant Tarling, February 13, 2020, https://www.facebook.com/PrincessCruises/videos/203765767439746/ (last visited August 14, 2020).

[44] *Id.*

[45] *Id.*

[46] *Id.*

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ                                    -16-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

HOLLAND, through Dr. Tarling, were well aware of what to look for in high risk situations, and knew how to advise passengers. But, as Plaintiffs here would discover, CARNIVAL did not apply its lessons from the DIAMOND PRINCESS to subsequent cruises, and neither did HOLLAND.

60.     In a February 18, 2020, update issued in response to the crisis aboard the DIAMOND PRINCESS, the CDC stated that "the rate of new reports of positives [now] on board, especially among those without symptoms, highlights the high burden of infection on the ship and potential for ongoing risk."[47]

61.     Upon information and belief, in or about February 2020, CARNIVAL also operated a voyage on the RUBY PRINCESS, from New Zealand to Australia. News reports suggest that in mid-to-late February, Defendants became aware of COVID-19 cases onboard the RUBY PRINCESS. Despite this information, CARNIVAL operated a second voyage on the RUBY PRINCESS, immediately following the New Zealand-to-Australia voyage. Since the vessel docked in Australia on March 19, 2020, over 600 passengers who were on the RUBY PRINCESS have tested positive for the virus and 10 have died. Australian authorities have announced a criminal investigation into the matter.

62.     CARNIVAL also operated two round-trip cruises from San Francisco aboard the M/V GRAND PRINCESS in February. The first ran between February 11, 2020 and February 21, 2020. The second departed on February 21, 2020 and, following days of being forced to circle off the coast of San Francisco, was finally allowed to dock in the port of Oakland on March 9, 2020. These trips spurred the Governor of California to declare a state of emergency, and are linked to multiple deaths in San Francisco and other areas of California. Defendants knew as early as February 19, 2020—and possibly earlier—that passengers aboard the M/V GRAND PRINCESS were suffering from symptoms associated with COVID-19.

---

[47] *See* Centers for Disease Control and Prevention, Update on the Diamond Princess Cruise Ship in Japan, Feb. 18, 2020, https://www.cdc.gov/media/releases/2020/s0218-update-diamond-princess.html (last visited April 6, 2020).

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ

-17-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN 37201
Tel. 615.313.9000 • Fax 615.313.9965

63.     As of April 2020, cruises run by CARNIVAL had been identified as responsible for more than 1,600 positive COVID-19 infections and over 50 deaths.[48]

**III.    Carnival Undertook an Independent Duty of Care Toward Plaintiffs**

64.     Through its public statements and conduct, Defendant CARNIVAL specifically undertook a duty to maintain a safe environment aboard the cruise ships in its fleet, including the MS ZAANDAM.

65.     For instance, CARNIVAL represented to its customers and the general public that it had a commitment to "[p]rotecting the health, safety and security of our passengers, guests, employees and all others working on our behalf, thereby promoting an organization that always strives to be free of injuries, illness and loss. … [and] assigning health, environment, safety, security (HESS) and sustainability matters the same priority as other critical business matters."[49]

66.     CARNIVAL further represented that it "[s]upport[s] a proactive framework of risk mitigation in the areas of HESS aimed at preventing, monitoring and responding to threats" and that it will "promptly report and properly investigate all HESS incidents and take appropriate action to prevent recurrence."[50] Notably, this website specifically identifies HOLLAND as a part of CARNIVAL CORPORATION and CARNIVAL PLC, representing that the policy applies to the subsidiary as well as the parent.

67.     CARNIVAL promulgated HESS policies for all of its cruise line brands, including HOLLAND. CARNIVAL's HESS Corporate Policy, which is available to the public

---

[48] Austin Carr and Chris Palmieri, *Socially Distance This: Carnival Executives Knew They Had a Virus Problem, But Kept the Party Going*, Bloomberg, April 16, 2020, https://www.bloomberg.com/features/2020-carnival-cruise-coronavirus/ (last visited Oct. 21, 2020).
[49] Carnival Health, Environment, Safety, Security & Sustainability Policy & Governance, Carnival Health, Environment, Safety, Security & Sustainability Policy & Governance, https://www.carnivalcorp.com/leading-responsibly/health-environment-safety-security-sustainability-policy-governance/ (last visited April 7, 2020).
[50] Carnival Corporation & PLC Health, Environmental, Safety, Security, and Sustainability Corporate Policy, https://www.carnivalcorp.com/static-files/0b8327aa-c3be-4022-a1a5-a6dad7123af7 (last visited September 30, , 2020).

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ
-18-
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

on CARNIVAL's website, states that CARNIVAL will "ensure compliance with this [HESS] policy within each of Carnival's Corporate and Operating Line organizations."[51]

68.     The 2016 federal plea agreement noted that CARNIVAL "currently monitors and supervises environmental, safety, security, and regulatory requirements for Princess and other Carnival brands." Prior to the government investigation that led to the plea agreement, CARNIVAL had "undertaken steps to strengthen and enhance its oversight and compliance structure." For example, "the company initiated structural changes within its management organization, primary among which was the creation of a position titled 'Chief Maritime Officer,' placing the responsibility for overall environmental, safety, and security compliance in one individual …."

69.     Given these assurances and representations, CARNIVAL undertook an independent duty to abide by its commitments and to protect passengers on all of its cruise lines, including HOLLAND, from reasonably-avoidable hazards, such as exposing passengers for a prolonged period of time on a ship known to be infested with a potentially-lethal virus.

**IV.     HOLLAND was an Apparent Agent of CARNIVAL**

70.     CARNIVAL represented to the public that HOLLAND was its agent, causing passengers to justifiably rely upon the care and skill of HOLLAND to maintain a safe environment aboard the MS ZAANDAM.

71.     On its website, CARNIVAL prominently displays the HOLLAND name and logo, describing HOLLAND as part of its "family" of cruise line brands. CARNIVAL's website states that potential customers "need look no further than the Carnival family when selecting a cruise vacation."

72.     CARNIVAL promulgated HESS policies for all of its cruise line brands, including HOLLAND. CARNIVAL's HESS Corporate Policy, which is available to the public

---

[51] *Id.*

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ                                     -19-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN 37201
Tel. 615.313.9000 • Fax 615.313.9965

on CARNIVAL's website, states that CARNIVAL will "ensure compliance with this [HESS] policy *within each of Carnival's Corporate and Operating Line organizations*."[52]

73.     The web page on which CARNIVAL publicizes its HESS policy specifically identifies HOLLAND as a part of CARNIVAL CORPORATION and CARNIVAL PLC, representing that the policy applies to the subsidiary as well as the parent.

## V.     What Makes Cruise Ships Different From Other Businesses

74.     In some material respects, in the context of COVID-19 claims, common carriers like cruise ships undertaking custodial, long-haul, open-water voyages present heightened risks to passengers that differ from other land-based businesses. With these heightened risks, as factual and legal matters, come additional attendant obligations on the owners and operators of cruise ships.

75.     As Defendants knew, cruise ships are particularly susceptible to rapid viral contagion because—unlike other businesses, such as restaurants, retail shops, and other consumer-facing businesses—after embarkation, passengers are effectively trapped onboard. HOLLAND and CARNIVAL had a custodial role over their passengers, who had no option for safe and fast exit while the vessel remained at sea.

76.     Cruise ships like MS ZAANDAM have a high population density, and the population is characterized by "relatively homogenous mixing"—meaning, there are a lot of people onboard, and they are all interacting with one another.[53]

77.     CARNIVAL and HOLLAND were and are well-aware of the fact that their crew members interact closely with passengers and often travel on multiple trips back-to-back, putting crew members into close contact with thousands of passengers in short periods of time. What's

---

[52] Carnival Corporation & PLC Health, Environmental, Safety, Security, and Sustainability Corporate Policy, https://www.carnivalcorp.com/static-files/0b8327aa-c3be-4022-a1a5-a6dad7123af7 (last visited September 30, 2020) (emphasis added).

[53] J. Rocklov and H. Sjodin, *COVID-19 outbreak on the Diamond Princess cruise ship: estimating the epidemic potential and effectiveness of public health countermeasures*, Journal of Travel Medicine, Published February 28, 2020, https://academic.oup.com/jtm/article/27/3/taaa030/5766334 (last visited August 12, 2020).

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ                                    -20-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

more, these crew members and the ship's passengers share a number of confined, public spaces—such as elevators and public restrooms—and interact with a myriad of shared, and frequently-touched surfaces, including but certainly not limited to the utensils used to serve food on buffet lines, elevator buttons, hand railings, chairs, cards and other game pieces, and door handles. The frequency with which individuals touch these surfaces along with the sheer number of people who come into contact with them in a limited period of time make cruise ships uniquely dangerous for the spread of viruses, including COVID-19.

78.     CARNIVAL and HOLLAND also understood, based on their years of specific experience operating cruise ships, the limited air flow and low ventilation in the interior of cruise ships, and they knew that these conditions make airborne viruses all the more hazardous on board a ship, particularly where passengers are exposed for a lengthy period of time during a long-haul, open-water voyage.

79.     The combination of the aforementioned factors, among other factors, make cruise ships distinctly susceptible to rapidly and pervasively spreading pathogens in ways that differ from most other businesses, which was well-known to Defendants.

80.     Years before the COVID-19 outbreaks aboard the DIAMOND PRINCESS, RUBY PRINCESS, GRAND PRINCESS, and M/S ZAANDAM, CARNIVAL and HOLLAND'S own Group Senior Vice President and Chief Medical Officer Grant Tarling, M.D., M.P.H. co-authored an article that acknowledged that cruise ships "represent a potential source for introduction of novel or antigenically drifted influenza virus strains to the United States" and that cruise ship characteristics, such as "close quarters and prolonged contact among travelers on ships and during land-based tours before embarkation, increase the risk of communicable disease transmission."[54]

---

[54] Kimberly B. Rogers, MPH, Shahrokh Roohi, MPH, Timothy M. Uyeki, MD, *et al.*, *Laboratory-based respiratory virus surveillance pilot project on select cruise ships in Alaska, 2013-2015*, Journal of Travel Medicine 2017, 1-6, at 2 (2017).

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ

-21-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

81.     A study published on February 28, 2020, echoed Dr. Tarling's findings, and highlights the unique conditions of cruise ships that "amplified" the spread of COVID-19 among those onboard the DIAMOND PRINCESS.[55] The study also revealed that extended periods of time on the ship without quarantine increased the spread of the virus.

82.     HOLLAND asserts that it has an "uncompromising commitment to safety," and touts the availability of 24-hours on-call medical staff.[56] Its website states that its "highest priorities are compliance, environmental protection and the health, safety and well-being of our guests, crew and the communities we visit."[57] HOLLAND explains that its "sanitation protocols have always been at the forefront of the cruise industry with comprehensive cleaning of public areas and staterooms with Oxivir, a solution used by many hospitals for cleaning and killing germs. Hand sanitizer also has been readily available, and staff have encouraged its use."[58]

83.     Given these assurances and representations, HOLLAND and CARNIVAL undertook a duty to abide by that commitment and to protect passengers from reasonably-avoidable hazards, such as exposing passengers for a prolonged period of time on a ship known to be infested with a potentially-lethal virus.

## VI.    Plaintiffs' Experiences Onboard the MS ZAANDAM

84.     Before boarding the MS ZAANDAM, Plaintiffs were not exhibiting any symptoms of COVID-19 nor had they been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19.

85.     The night before Plaintiffs boarded the MS ZAANDAM in Buenos Aires, they received an email from HOLLAND touting the companies' "deep partnerships with global health experts" and the "enhanced screening, prevention and control procedures" HOLLAND said it

---

[55] J. Rocklov and H. Sjodin, *COVID-19 outbreak on the Diamond Princess cruise ship: estimating the epidemic potential and effectiveness of public health countermeasures*, Journal of Travel Medicine, Published February 28, 2020, https://academic.oup.com/jtm/article/27/3/taaa030/5766334 (last visited August 12, 2020).
[56] Holland America Line, 2020 What You Need to Know Before You Go, https://www.hollandamerica.com/en_US/faq/know-before-you-go.html
[57] https://www.hollandamerica.com/en_US/news/coronavirus-travel-advisory/traveling-and-staying-healthy.html
[58] https://www.hollandamerica.com/en_US/news/coronavirus-travel-advisory/traveling-and-staying-healthy.html

was instituting on its ships. This email also gave Plaintiffs the option of cancelling their trip—though provided no option to fund their return to the United States—in exchange for a future cruise credit. HOLLAND assured Plaintiffs that it was taking health precautions "seriously." In another email sent by HOLLAND to Plaintiffs on March 3, 2020, HOLLAND informed Plaintiffs that all guests boarding the MS ZAANDAM would be "subject to pre-boarding health reporting and enhanced screening at check-in."

86.     On March 7, 2020, Plaintiffs and the Class boarded onto the MS ZAANDAM in Buenos Aires, Argentina. The MS ZAANDAM's passengers had traveled from all over the world to meet the ship in Buenos Aires. Upon information and belief, some of these passengers traveled from regions of the world—like Europe—that, by or before March 7, 20202, were experiencing high rates of coronavirus infection. These high rates were well-documented in international press.

87.     Plaintiffs' experience boarding the MS ZAANDAM did not comport with the assurances they had received from HOLLAND. When Plaintiffs boarded the MS ZAANDAM, they were not subject to any additional preventative measures. For instance, Defendants did not require Plaintiffs to take their temperature, and did not provide any mechanism that would allow Plaintiffs to do so. Additionally, Defendants did not implement social distancing among the passengers, or implement other reasonable precautions at this stage of the cruise. Upon information and belief, Defendants did not take any measures different from their typical preparations for a voyage, and made no COVID-19-specific efforts to prevent or contain contagion at the time of initial embarkation.

88.     The ship departed on Buenos Aires on March 8, 2020. The first leg of the trip was set to end in San Antonio, Chile, on March 21, 2020. The ship's schedule called for a second leg of the voyage, from San Antonio to Ft. Lauderdale, Florida, which was planned to conclude on April 7, 2020. Plaintiffs were scheduled to go on both legs of the cruise.

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ

-23-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

89.     On March 11, 2020, the World Health Organization declared coronavirus a global pandemic.

90.     The MS ZAANDAM made three ports of call, including one in Punta Arenas, Chile, where passengers disembarked the ship to participate in tours and site visits, and then returned to the ship. In Punta Arenas—but at no other ports of call—passengers were required to have their temperatures checked before going on land. However, Defendants did not conduct any additional screenings when Plaintiffs and other members of the class came back aboard.

91.     After leaving Punta Arenas, the ship then made its way toward its next stop— Ushuaia, Argentina. Before it arrived, however, Argentina announced it was closing its borders to cruise traffic.

92.     On March 13, 2020, while the MS ZAANDAM was still at sea, HOLLAND announced that, due to the pandemic, it was suspending its cruise operations for 30 days.

93.     On or about March 14, 2020, Argentina denied the MS ZAANDAM entry to its ports and the vessel made its way back toward Chile, hoping to unload passengers at its prior stop in Punta Arenas.

94.     On March 15, 2020, passengers learned that Defendants had canceled the remaining itinerary for the MS ZAANDAM. Passengers received a letter from HOLLAND apologizing for the trip's "abrupt end."[59]

95.     On information and belief, the decision to cancel the remainder of the voyage came in response to the pandemic and an announcement from South American ports that they would not accept cruise ship traffic. On or about that same day, Chile also denied the MS ZAANDAM entry to its ports. Passengers—including Plaintiffs—were not informed of when or where the ship would dock, or when they would be allowed to disembark.

---

[59] Aine Cain, *Inside the deadly voyage of 2 Holland America cruises stricken with coronavirus and stranded at sea for weeks with hundreds of sick passengers*, Business Insider, April 4, 2020, https://www.businessinsider.com/holland-america-zaandam-rotterdam-coronavirus-stricken-ships-2020-4 (last visited June 9, 2020)

96.     In the days following HOLLAND's notice to passengers about the itinerary cancellation, the MS ZAANDAM continued its voyage, but with no set destination. During this time, Defendants became aware that multiple crew members and passengers were exhibiting symptoms of COVID-19. Upon information and belief, this information would have triggered mandatory reporting under 42 CFR 71.1 *et seq.* and constitutes a "hazardous condition" per 33 CFR § 160.216.[60] Nevertheless, passengers continued to gather in large crowds, attend cruise ship events, and share meals together, at the encouragement of Defendants. In fact, Defendants instituted *additional* group activities, like trivia nights and dance parties, to entertain passengers while they were stuck at sea.

97.     It was not until approximately one week after the ship was denied entry to South American ports that Defendants took any steps to address potential COVID-19 exposure to passengers and crew members. Beginning on or around March 22, 2020, guests were asked to isolate themselves in their staterooms. Their meals were delivered to them by crew members, who also handled their laundry services. Prior to that date, Defendants provided passengers on the ship, including Plaintiffs, with no fore-warning that passengers and crew members were experiencing flu-like symptoms, although Defendants were aware of the growing population of ill passengers for many days.

98.     They were permitted limited trips outside their stateroom and no masks were provided for these trips.

99.     On information and belief, by or around March 24, 2020, approximately 30 passengers and 47 crew members had reported to the MS ZAANDAM's infirmary due to respiratory and flu-like symptoms. Within a few days, at least 20 more passengers would report feeling ill and experiencing symptoms associated with COVID-19.

---

[60] Section 160.216 requires that "[w]henever there is a hazardous condition … on board a vessel or caused by a vessel or its operation, the owner, agent, master, operator, or person in charge must immediately notify the nearest Coast Guard Sector Office . . . ." A "[h]azardous condition means any condition that may adversely affect the safety of any vessel … or the environmental quality of any port, harbor, or navigable waterway of the United States. It may, but need not, involve … injury *or illness of a person aboard* … ." 33 CFR § 160.202 (emphasis added).

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ

-25-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

100.     Defendants sent the MS ROTTERDAM to meet the MS ZAANDAM off the coast of Panama in order to deliver COVID-19 tests, ventilators, and other supplies to the vessel. Shortly after the MS ROTTERDAM departed to meet the MS ZAANDAM, however, Defendants instructed that the MS ROTTERDAM would, in fact, take on passengers from the MS ZAANDAM.

101.     On March 26, 2020, audio of the captain of the MS ROTTERDAM leaked in which he announced to crew members aboard the MS ROTTERDAM that four "older" passengers aboard the MS ZAANDAM had died onboard, on or around the 26th. The next day, March 27, 2020, the crew of the MS ZAANDAM announced the deaths on the public address system. HOLLAND has since confirmed that two of these deaths were related to COVID-19. It has not provided details about the other two.

102.     On or about March 27, 2020, while still onboard the MS ZAANDAM, Plaintiff Zehner began experiencing symptoms consistent with COVID-19. Eventually, Zehner received a COVID-19 test, and the results showed that he was positive for the virus. At that point, Zehner was re-located to another area of the ship.

103.     Based on the timing of the onset of his symptoms and his test results, it is more likely than not that Plaintiff Zehner contracted COVID-19 during the subject voyage.

104.     Also on March 27, 2020—as a result of the vast number of sick passengers and crew members—the MS ZAANDAM was denied transit through the Panama Canal.

105.     On or around the same day, asymptomatic MS ZAANDAM passengers and some staff were transferred to the MS ROTTERDAM. Passengers onboard the MS ZAANDAM who had become ill or were experiencing COVID-19 symptoms, along with their "close contacts" remained onboard the MS ZAANDAM. Plaintiffs Zehner and Lindsay remained on the MS ZAANDAM.

106.     On or about March 28, 2020 or March 29, 2020, Panama agreed to allow the MS ZAANDAM to transit through the canal en route to Florida.

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ

-26-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN 37201
Tel. 615.313.9000 • Fax 615.313.9965

107.    In late March 2020, when the MS ZAANDAM was still seeking a port in which it would be allowed to dock and disembark passengers, CARNIVAL's Chief Maritime Officer William Burke met with the Broward County (Florida) Commission to negotiate permission for the MS ZAANDAM to dock in Port Everglades, Florida.[61] Following extended public debate about whether the state of Florida would accept the vessel, on or about April 1, 2020, the MS ZAANDAM arrived at port in Port Everglades, Florida.

108.    The following day, some passengers and crew members were allowed to disembark, but most remained on their respective ships. Approximately 107 passengers on either the MS ZAANDAM or the MS ROTTERDAM, and 143 crew members on the MS ZAANDAM had experienced COVID-19-related symptoms.

109.    The following day, April 3, 2020, most of the remaining passengers onboard the MS ZAANDAM and the MS ROTTERDAM disembarked.

110.    After passengers disembarked, they were taken, when possible, to hospitals or provided with means of traveling to their homes, where they then remained in self-quarantine.

111.    Plaintiff Lindsay sought to get tested for COVID-19 but cruise staff discouraged him from doing so, threatening that if he took a test, he would be forced to remain on the ship for many days rather than be able to go home.

112.    Plaintiffs Zehner and Lindsay, who are married, both remained on the MS ZAANDAM, because no local hospital would accept Zehner, whose condition had worsened.

113.    Finally, on April 5, 2020, an Orlando hospital agreed to accept Zehner as a patient and he was transported by helicopter to Advent Health Orlando Hospital. Zehner was placed on a ventilator shortly after arriving. He remained on a ventilator for approximately three weeks. Eventually he was transported to Select Specialty Longterm Acute Care Hospital South Orlando. And, on June 2, 2020, he was transported to Vanderbilt Stallworth Rehabilitation Hospital in

---

[61] Jonathan Levin, *Carnival Begs for Docks for Virus-Beset Ships After Weeks at Sea*, Bloomberg, March 31, 2020, https://www.bloomberg.com/news/articles/2020-03-31/carnival-begs-for-permission-to-dock-virus-beset-ship-in-florida (last visited October 10, 2020).

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ
-27-
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN 37201
Tel. 615.313.9000 • Fax 615.313.9965

1   Nashville, Tennessee. As of this filing, Plaintiff Zehner has been released to his home, but has

2   not yet made a full recovery.

3       114.    Plaintiff Lindsay was forced to remain onboard the ship until April 9, 2020. He

4   was not tested for the virus at any time while onboard. After disembarking, he returned to

5   Nashville after Zehner was taken to the hospital and, at that point, began a new period of

6   quarantine.

7       115.    Plaintiff Lindsay believes he also caught the virus on the ship and fears long-term

8   health effects. However, to date, he has not received a positive test confirming whether he had

9   the virus.

10      116.    As a direct and proximate result of Defendants' negligence and gross negligence,

11  Plaintiff Zehner was exposed to and suffered from COVID-19 while onboard the MS

12  ZAANDAM and, as a direct result of Defendants' negligence, continues to suffer from the

13  effects of this illness.

14      117.    As a direct and proximate result of the negligence and gross negligence of

15  Defendants in exposing Plaintiffs and Class Members to actual risk of immediate physical injury,

16  Plaintiffs and Class Members suffered injuries and emotional distress of the nature and type that

17  reasonable persons would suffer under the circumstances alleged in this Complaint, including,

18  but not limited to, suffering anguish, fright, horror, nervousness, grief, anxiety, worry, shock,

19  humiliation and shame.

20      118.    Plaintiffs and Class Members were traumatized by the fear of developing

21  COVID-19 as well as by their confinement on an infected vessel in isolation for approximately

22  two weeks, in some cases knowing that their friends and loved ones were suffering from a

23  potentially lethal illness. Plaintiffs and Class Members also suffered from significant emotional

24  distress caused by the fear, after disembarking from the cruise, that they or their friends and

25  family would succumb to COVID-19 and suffer illness, and possibly death, as a result of

26  Defendant's negligence and gross negligence.

119.    Furthermore, as public health experts and physicians learn more about the myriad ways COVID-19 attacks and damages the body, Plaintiffs and Class Members develop new and evolving medical fears and uncertainties that require and will continue to require medical diagnostic exams. Plaintiffs and the Class Members are suffering and will continue to suffer due to the ever-present fear and anxiety that they will or may later experience negative health outcomes or complications as a direct and proximate result of being exposed to, and potentially contracting, COVID-19 because of Defendants' negligent and grossly negligent acts and omissions.

120.    Plaintiffs expect that they and Class Members will continue to suffer and will, in the future, require medical services not of a kind generally accepted as part of the wear and tear of daily life, as a result of Defendants' negligence and gross negligence.

**VII.    The Cruise Contract**

121.    The Cruise Contract provided to Plaintiffs and Class members prior to the embarkation of the cruise purports to govern Plaintiffs' claims and available remedies.

122.    The Cruise Contract is a standardized contract of adhesion written by Defendants and provided to Plaintiffs and Class members with no opportunity for review or negotiation.

123.    The Cruise Contract is unfairly one-sided, against public policy, unconscionable and, as such, in unenforceable.

124.    Plaintiffs and Class members did not receive the Cruise Contract, if at all, until well after the time period during which they could refuse its terms (i.e. by cancelling their cruise) without being subject to significant fees, sometimes costing up to thousands of dollars. Providing the Cruise Contract to passengers at this late date constitutes surprise and is procedurally unconscionable.

125.    Upon information and belief, the cruise cancellation policy would have barred Plaintiffs from recovering all of their money back if cancellation was attempted only shortly before the cruise set sail.

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ                                    -29-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN 37201
Tel. 615.313.9000 • Fax 615.313.9965

126.     Plaintiffs were not reasonably informed of the Cruise Contract, including its class waiver provision. If they had been reasonably informed, their only recourse to reject the provision would have required canceling their reservations, which would have subjected Plaintiffs to potentially thousands of dollars in monetary penalties, including forfeiture of their deposits and/or purchase amount. The effect of delivering this standard, un-negotiated contract, to passengers at such a late date was to force Plaintiffs to accept the terms of the Cruise Contract with no viable recourse.

127.     By purporting to strip Plaintiffs and Class members of their rights to pursue class action litigation, HOLLAND and CARNIVAL effectively give themselves license to engage in bad business practices and dangerous and/or negligent conduct, regardless of whether it will harm passengers in the aggregate, because Defendants know that it will be impossible for *all* passengers to file suit and seek a remedy for their injuries.

## VIII.    The CDC's Definition of a "Probable Case"

128.     In an April 5, 2020 position statement, the CDC and the Council of State and Territorial Epidemiologists ("CSTE") provided an "interim case definition" for COVID-19 for the purposes of counting and tracking "probable" and "confirmed" COVID-19 cases in the United States.[62]

129.     The interim definition provided three alternative clinical measures for evaluating a patient.

130.     First, a case meets the clinical criteria if there is no alternative more likely diagnosis and at least two of the following symptoms are present: fever (measured or subjective), chills, rigors, myalgia, headache, sore throat, or new olfactory and taste disorder(s).

---

[62] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19) 2020 Interim Case Definition, Approved April 5, 2020, https://wwww.cdc.gov/nndss/conditions/coronavirus-disease-2019-covid-19/case-definition/2020/ (last visited August 14, 2020).

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ

-30-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN 37201
Tel. 615.313.9000 • Fax 615.313.9965

131.    Second, a case meets the clinical criteria if there is no alternative more likely diagnosis and at least one of the following symptoms are present: cough, shortness of breath, or difficulty breathing.

132.    Third, a case meets the clinical criteria if there is no alternative more likely diagnosis and a patient suffers from severe respiratory illness with at least one of either clinical or radiographic evidence of pneumonia or acute respiratory distress syndrome.

133.    The interim definition also provided that a case meets the laboratory criteria if there are positive results returned from a diagnostic test, an antigen test, or an antibody test.

134.    And, the CDC and CSTE identified a number of "epidemiological" criteria that should be considered when evaluating a potential COVID-19 case. Specifically, whether the patient was within 6 feet for 10 to 30 minutes or more with a person who has a confirmed or probable COVID-19 case; whether the patient was within 6 feet for 10 to 30 minutes or more with a person with a "clinically compatible illness" and some link exists to a confirmed COVID-19 case; whether the patient traveled to or resided in an area with sustained, ongoing community transmission of COVID-19; and/or whether the patient is a member of an at-risk cohort.

135.    Patients who meet both the clinical and epidemiological criteria are considered probable COVID-19 cases, as are those patients who presumptively meet the laboratory criteria and either the clinical or epidemiological criteria.

136.    The position statement also recognized that "field investigations will involve evaluations of persons with *no symptoms* and *these individuals will need to be counted as cases*."

137.    In addition to the above-listed clinical criteria, the CDC has published more up-to-date information regarding the range of symptoms created by COVID-19. This list, which the CDC concedes is not comprehensive, includes:

      a.    Fever or chills

      b.    Cough

      c.    Shortness of breath or difficulty breathing

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ
-31-
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

1    d.    Fatigue

2    e.    Muscle or body aches

3    f.    Headache

4    g.    New loss of taste or smell

5    h.    Sore throat

6    i.    Congestion or runny nose

7    j.    Nausea or vomiting

8    k.    Diarrhea.[63]

9                          **REQUEST FOR INJUNCTIVE RELIEF**

10       138.    Plaintiffs traveled on the MS ZAANDAM, a cruise ship owned and operated by

11   CARNIVAL and HOLLAND. In the future, Plaintiffs intend to go on cruises again, including

12   cruises operated by Defendants, if corrective action is taken such that Plaintiffs can reasonably

13   rely on Defendants to protect their health and safety.

14       139.    Indeed, Defendants have proactively marketed to Plaintiffs and Class members,

15   who were passengers onboard the MS ZAANDAM, urging them to schedule future cruises with

16   the companies. Defendants have offered reduced fares and other incentives to encourage

17   Plaintiffs and the Class to book future travel with CARNIVAL and HOLLAND. And,

18   Defendants continue to offer assurances that they are taking proactive measures to combat

19   COVID-19 aboard their ships and prevent future outbreaks.

20       140.    Plaintiffs Lindsay and Zehner accepted an $800 cruise credit offered by

21   Defendants toward future HOLLAND cruises, but Defendants required recipients of cruise

22   credits to book their cruise by December 31, 2020, underscoring that CARNIVAL and

23   HOLLAND fully expect that passengers, including Plaintiffs, will embark on a

24

25   _____

26   [63] Center for Disease Control and Prevention, Symptoms of Coronavirus, Updated May 13, 2020
     https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html# (last visited August 14, 2020).

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ                      -32-                LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                                                     222 Second Avenue, South, Suite 1640
                                                                     Nashville, TN  37201
                                                                     Tel. 615.313.9000 • Fax 615.313.9965

1  CARNIVAL/HOLLAND cruise in the near future. Plaintiffs Lindsay and Zehner used their

2  cruise credit to book a cruise in September, 2021.

3      141.    HOLLAND asserts that guests can "book with confidence,"[64] and provides

4  information about its "Enhanced Health Protocols." These protocols asserting only that

5  HOLLAND is "planning" potential enhancements, including that "[a]ll guests and crew

6  embarking a ship will undergo enhanced pre-embarkation health screening in accordance with

7  prevailing health best practices[, which] may include health questionnaires and touch-free

8  temperature checks as appropriate." HOLLAND says it will also have "staterooms and public

9  areas sanitized multiple times a day with cleaning and disinfection protocols developed in

10  coordination with the U.S. Centers for Disease Control & Prevention (CDC)."[65] HOLLAND

11  further states that it will provide "[o]ngoing training and education of shipboard medical staff in

12  the latest clinical care practices for managing COVID-19 cases."[66]

13      142.    CARNIVAL states that they will be providing "health screening, illness

14  surveillance, and health education" along with "environmental sanitization" in order to protect

15  passengers on future cruises.[67]

16      143.    Defendants have advertised that they plan to begin operating cruises in early

17  2021. There can be no guarantee that COVID-19 will not be present and still rapidly spreading

18  throughout communities in the United States and internationally. Thus, exposure to COVID-19

19  will continue to be a significant risk to passengers on cruise ships—including Plaintiffs when

20  they travel—absent appropriate, effective measures from CARNIVAL and HOLLAND.

21      144.    Without accurate and necessary information from CARNIVAL and HOLLAND

22  regarding the risks of exposure onboard their vessel(s), recent exposure or potential exposure of

23  passengers and crew members onboard their vessel(s), and whether CARNIVAL and

---

[64] https://www.hollandamerica.com/en_US/book-with-confidence.html
[65] https://www.hollandamerica.com/en_US/news/coronavirus-travel-advisory/traveling-and-staying-healthy.html
[66] https://www.hollandamerica.com/en_US/news/coronavirus-travel-advisory/traveling-and-staying-healthy.html
[67] Carnival Corporation & PLC, Investor Relations: Carnival Corporation Update on Operations,
https://www.carnivalcorp.com/Updates-on-Cruise-Operations (last visited August 14, 2020).

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ
-33-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN 37201
Tel. 615.313.9000 • Fax 615.313.9965

HOLLAND have any reason to believe that their vessel(s) may be infested with COVID-19 or other communicable disease, Plaintiffs will not be able to make informed decisions about whether to travel on cruises operated by CARNIVAL and HOLLAND.

145.    Another critical concern for Plaintiffs, who plan to take cruises again when they are able to do so, is whether they can rely on CARNIVAL and HOLLAND to faithfully inform Plaintiffs and other future cruise passengers about potential safety hazards, including and especially viral outbreaks, and whether CARNIVAL and HOLLAND will take reasonable and necessary steps to protect from and mitigate risks and harms associated with communicable diseases, including COVID-19.

146.    This concern is especially acute for Plaintiffs here in light of the multiple outbreaks experienced by passengers onboard vessels owned by CARNIVAL and HOLLAND, including but not limited to the MS ZAANDAM. Plaintiffs also expect that, absent an injunction, they will experience future injury because CARNIVAL and HOLLAND previously asserted their commitment to passengers' safety, well-being, and comfort and assured certain Plaintiffs that they would institute particular screening measures, but then failed to do so, and failed to take other effective measures to ensure that Plaintiffs were not exposed to COVID-19.

147.    Moreover, CARNIVAL and HOLLAND's actions and omissions exacerbated and hastened the spread of COVID-19 onboard the MS ZAANDAM, exposing Plaintiffs to a potentially-lethal viral contagion.

148.    Plaintiffs face a real threat that, absent an injunction, they are likely to be subject to the same acts and omissions by CARNIVAL and HOLLAND that will once again expose them to COVID-19 and/or other communicable disease that will cause them injury and emotional harms.

149.    CARNIVAL's and HOLLAND's ongoing adherence to their HESS policy and their implementation of additional effective measures specifically to protect passengers from contracting COVID-19 is and will continue to be a substantial, necessary, and material factor in

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ
-34-
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN 37201
Tel. 615.313.9000 • Fax 615.313.9965

1    Plaintiffs' taking future cruises. Without injunctive relief, Plaintiffs cannot be assured that

2    CARNIVAL and HOLLAND will discharge their duties to Plaintiffs on future cruise voyages

3    and/or that they will abide by the representations and assurances that they have made to

4    Plaintiffs, and are likely to once again suffer harms like those alleged in this Complaint.

5                                              **NOTICE**

6           150.    Section 15 (A)(i) of the Cruise Contract purports to required that claimants

7    provide notice to HOLLAND and CARNIVAL of any potential claims.  Although Plaintiffs do

8    not concede that this provision is enforceable, Plaintiffs and Class Members complied with this

9    requirement by providing written notice to Defendants' electronically on June 18, 2020.

10                                **CLASS ACTION ALLEGATIONS**

11          151.    Plaintiffs bring this lawsuit as a class action on behalf of themselves and all

12   similarly-situated persons pursuant to Federal Rules of Civil Procedure 23(a) and (b)(1), (b)(2),

13   (b)(3), and/or (c)(4). This action satisfies the applicable numerosity, commonality, typicality,

14   adequacy, predominance, and/or superiority requirements of those provisions.

15          152.    The proposed Class is defined as follows:  All persons in the United States, who

16   sailed as passengers on the MS ZAANDAM cruise that departed from Buenos Aires, Argentina,

17   on March 8, 2020.

18          153.    Excluded from the proposed Class are: (1) CARNIVAL and HOLLAND, any

19   entity or division in which either have a controlling interest, and its legal representatives,

20   officers, directors, assigns and successors; (2) the judicial officer(s) to whom this case is

21   assigned and the judicial officer(s)' immediate family and legal staff; and (3) governmental

22   entities. Plaintiffs reserve the right to amend the Class definition if discovery and further

23   investigation reveal that the Class should be expanded, otherwise divided into subclasses, or

24   modified in any other way.

25

26

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ                              -35-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

154.     The individual Plaintiffs named in this complaint support the use of the class action mechanism to achieve economy, efficiency, fairness and consistency of result by determining the important common questions raised in this action on a common basis.

A.     **Numerosity**

155.     There were, on information and belief, approximately 1,243 passengers on the MS ZAANDAM for the cruise that is the subject of this action. Their exact number and identities can be readily ascertained from Defendants' records. The individual joinder of all passengers is impractical, and the class action procedure is more practical, cost-effective, inclusive, and efficient than multiple lawsuits on the common questions of law and fact that unite the class, or piecemeal and incomplete individual joinder. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in Defendants' possession, custody, or control, as well as from records kept by the Department of Health and Human Services.

B.     **Typicality**

156.     Plaintiffs' claims are typical of the claims of Class Members in that Plaintiffs, like all Class Members, sailed on the MS ZAANDAM cruise that boarded on March 7, 2020 and departed on March 8, 2020. Plaintiffs, like all Class Members, were damaged by Defendants' misconduct in that they sailed on a cruise they would not have sailed on and suffered significant injury, emotional distress and economic damage, including medical monitoring, caused by the negligence of Defendants, and each of them. The factual bases of CARNIVAL and HOLLAND's misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all Class Members.

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ                                    -36-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

C. **Adequate Representation**

157.     Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs have retained counsel with substantial experience in prosecuting class actions, aggregate suits, and mass torts.

158.     Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of all Class Members, and have the financial resources to do so. Neither Plaintiffs nor their counsel has interests adverse to those of the Class Members.

D. **Predominance of Common Issues**

159.     There are numerous questions of law and fact, including those related to Defendants' knowledge, conduct, and duties throughout the events described in this Complaint, common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and factual issues include, inter alia:

a.     what Defendants knew about the presence and risks associated with the COVID-19 virus, and contagions generally, and when they knew it;

b.     whether Defendants should have canceled the subject cruise to avoid exposing passengers to a deadly pathogen and/or taken other steps to avoid exposing passengers to a deadly pathogen, particularly after learning that passengers on the Diamond Princess and Grand Princess had become ill and died as a result of COVID-19, such as imposing social distancing requirements, eliminating mass gatherings, and quarantining;

c.     whether Defendants had a duty to institute screening and medical examination protocols before boarding passengers onto the MS ZAANDAM;

d.     whether Defendants should have provided warning to the Class about the high risks presented by viral infection on cruise ships, in light of the quickly rising spread of COVID-19 throughout the globe;

1         e.     whether Defendants had a duty to implement social distancing and/or

2    quarantine measures immediately after they became aware that passengers were experiencing

3    symptoms of COVID-19;

4         f.     whether Defendants should have warned Plaintiffs and the Class that

5    passengers onboard the MS ZAANDAM were suffering from COVID-19 symptoms;

6         g.     whether Defendants effectively and appropriately disinfected and sanitized

7    the MS ZAANDAM before they boarded passengers onto the ship on March 7, 2020, and/or

8    while the ship was at sea;

9         h.     interpretation of the applicable contract documents and the associated

10   "Passenger Bill of Rights" incorporated therein;

11        i.     whether Defendants acted as alter egos and/or agents, such that they

12   should be held jointly liable for the conduct alleged herein;

13        j.     whether CARNIVAL is liable for the acts, omissions, and violations

14   described in this Complaint;

15        k.     whether HOLLAND is liable for the acts, omissions, and violations

16   described in this Complaint; and

17        l.     whether the conduct of any or all of the defendants warrants the

18   imposition of punitive damages, to vindicate the societal interest in punishment and deterrence.

19   **E.**     **Superiority**

20   160.     Plaintiffs and Class Members have all suffered and will continue to suffer harm

21   and damages as a result of CARNIVAL's and HOLLAND's unlawful and wrongful conduct. A

22   class action is superior to other available methods for the fair and efficient adjudication of this

23   controversy.

24   161.     Absent a class action, most Class Members would likely find the cost of litigating

25   their claims prohibitively high and would therefore have no effective remedy at law. Because of

26   the relatively small size of the individual Class Members' claims (compared to the cost of

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ
-38-
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

litigation), it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy.

162.     Class treatment of common questions of law and fact is superior to other available procedures, such as multiple individual actions or piecemeal litigation because class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

### F.      Limited Fund

163.     In an abundance of caution, Plaintiffs take note of the presently apparent financial circumstances of CARNIVAL and/or HOLLAND to allege the possibility that their assets and resources available to fairly compensate Plaintiffs and Class Members, to satisfy appropriate punitive damages awards, and/or otherwise fairly address the claims against them may constitute a "limited fund" within the meaning of *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), such that class certification under Rule 23(b)(1)(B) is necessary and appropriate as a matter of due process and equity.

### G.      Mass Action

164.     In the alternative, this matter should proceed as a mass action, as defined in 28 U.S.C. § 1332 (d)(11)(B)(i), and should be tried jointly on the ground that Plaintiffs' claims involve common questions of law or fact, including as set forth above.

165.     Plaintiffs' individual claims exceed the required jurisdictional amount of $75,000.00.

### CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### NEGLIGENCE AGAINST ALL DEFENDANTS

166.     Plaintiffs re-allege all allegations in paragraphs 1 through 155 as if alleged fully herein.

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ

-39-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

167.     CARNIVAL and HOLLAND owed Plaintiffs, and the Class, who were passengers who boarded the MS ZAANDAM on March 7, 2020, and who Defendants therefore had a custodial relationship over, a duty to ensure that they would not be exposed to an unreasonable risk of harm.

168.     CARNIVAL and HOLLAND held themselves out as committed to and responsible for ensuring the health and safety of their vessels and the passengers onboard those vessels—including the MS ZAANDAM. Plaintiffs and Class members took Defendants at their word and put themselves in Defendants hands for the full duration of the voyage that is the subject of this Complaint. Plaintiffs and Class members relied on Defendants to ensure their security. Thus,, CARNIVAL and HOLLAND owed Plaintiffs and the Class a duty to take actions to prevent and mitigate the risk of threats to passengers' health and safety, including by ensuring that the MS ZAANDAM was properly cleaned, disinfected, and safely maintained, and that passengers were provided with the information necessary to take effective protective measures for their health and well-being. Furthermore, Defendants owed Plaintiffs and Class members a duty to not take actions that would exacerbate the spread and threat of COVID-19 onboard the ship.

169.     Defendants knew or should have known the unique conditions aboard cruise ships that create a particular risk of viral outbreak. Defendants knew or should have known that cruise ships owned and operated by Defendants had been the sites of prior, lethal outbreaks of COVID-19, and should have been aware of new guidelines for the cruise industry published by Dr. Hadjichristoulou and a team of European experts on February 3, 2020. In particular, Defendants had knowledge of the actual risks facing passengers based on the outbreak of the virus on the Diamond Princess, Ruby Princess, and Grand Princess.

170.     Defendants failed to do what a reasonably careful cruise ship owner and operator would do under the circumstances.

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ

-40-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

171.    Defendants breached their duties to Plaintiffs and the Class when, with the aforementioned knowledge, Defendants nevertheless chose to board Plaintiffs and the Class—passengers who had traveled to Buenos Aires from all over the world—onto the MS ZAANDAM without effective screening procedures, and chose to embark on the instant voyage.

172.    Defendants also breached their duties when, with that same knowledge, they chose not to screen or medically examine any crew members in advance of the instant cruise.

173.    Defendants further breached their duties to Plaintiffs and the Class when, with the above-mentioned knowledge, Defendants negligently chose during the instant voyage not to notify Plaintiffs and the Class of: the actual risk that the ship was infested with COVID-19; the actual and extreme risks of contracting COVID-19 while using facilities on the vessel; and/or the actual and extreme risks of contracting COVID-19 while mingling with passengers and crew who were suffering or had suffered from COVID-19 symptoms and their close contacts.

174.    Additionally, Defendants breached their duties to Plaintiffs and the Class when they became aware that passengers onboard the MS ZAANDAM were experiencing symptoms of COVID-19 and Defendants failed to promptly notify Plaintiffs and the Class and failed to promptly implement measures—such as social distancing or quarantine—to prevent and mitigate the spread of COVID-19 aboard the ship.

175.    If Defendants had adequately informed Plaintiffs and the Class prior to boarding, or at any other time, of the relevant information in Defendants' possession, including the acute risk of viral contagion on cruise ships, the lack of adequate screening, lack of adequate disinfecting procedures, lack of adequate quarantining procedures, and the actual risk of exposure, Plaintiffs and the Class could have made informed decisions about their health and their families' health, including disembarking from or not boarding the vessel.

176.    Defendants repeatedly breached their duties to Plaintiffs and the Class when, throughout the instant voyage, with the aforementioned knowledge, they chose not to inform Plaintiffs of the continuing and growing risks of contracting COVID-19.

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ

-41-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN 37201
Tel. 615.313.9000 • Fax 615.313.9965

177.     Finally, Defendants continued to breach their duties to Plaintiffs and the Class when, prior to March 22, with the aforementioned knowledge and without any warning to Plaintiffs and the Class, they, *inter alia*, chose not to implement quarantine or social distancing protocols; chose to continue operating large, public gatherings and meals; chose to continue to operate daily turndown service; and chose to continue hosting communal activities.

178.     As a direct and proximate result of Defendants' failure to safeguard Plaintiffs and the Class, Plaintiffs and the Class were at actual risk of immediate physical injury.

179.     As a direct and proximate result of Defendants' breach of their duties of care, Plaintiff Zehner became infected and was diagnosed with COVID-19 and Plaintiff Lindsay was put in imminent danger of suffering from severe and lethal illness.

180.     As a direct and proximate result of HOLLAND's and CARNIVAL'S failure to safeguard Plaintiffs and the class, and as a direct and proximate result of HOLLAND's and CARNIVAL's other acts and omissions as laid out herein, Plaintiffs were directly exposed COVID-19 and to actual risk of immediate physical injury, Plaintiffs and the Class have suffered physical injury, emotional distress of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, including, but not limited to, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation and shame. They were traumatized by the reasonable apprehension of developing COVID-19. They were confined on an infected vessel in isolation. It is expected that they will continue to suffer and will, in the future, require medical services not of a kind generally anticipated as part of the effects of daily life.

**SECOND CAUSE OF ACTION**
**GROSS NEGLIGENCE AGAINST ALL DEFENDANTS**

181.     Plaintiffs re-allege all allegations in paragraphs 1 through 170 as if alleged fully herein.

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ                                                     -42-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

182.     Defendants HOLLAND and CARNIVAL owed duties to Plaintiffs and the Class to:  safeguard against and mitigate the risks of passenger injury and illness; appropriately disinfect and sanitize the MS ZAANDAM, in light of the circumstances of a global pandemic; notify Plaintiffs and the Class of the actual and especially high risk of contracting COVID-19 aboard the MS ZAANDAM; and implement medical screening and examination protocols for crew and passengers.

183.     Defendants HOLLAND and CARNIVAL knew of the unreasonably high risk of viral contagion of COVID-19 on cruise ships, and Defendants knew that it was especially dangerous to expose Plaintiffs and the rest of the Class to COVID-19 in light of the situations on the Diamond Princess, Ruby Princess, and Grand Princess.

184.     Defendants' conduct in deciding to continue to operate the MS ZAANDAM with Plaintiffs and the Class aboard, even with the aforementioned knowledge, demonstrates an intentional failure to do what a reasonably careful cruise ship owner and operator would do under the circumstances, exhibits a willful and conscious disregard for the safety of Plaintiffs and the Class, and evidences recklessness and indifference by Defendants, which constitutes gross negligence.

185.     Defendants' failure to quarantine or otherwise shelter in their cabins the passengers and crew members prior to March 22 demonstrates a willful and conscious disregard for the rights and safety of others and amounts to an extreme departure of what a reasonably careful cruise ship owner and operator would do.

186.     Defendants' choice not to warn Plaintiffs and the Class of their actual risk of harm in being exposed to COVID-19, either prior to boarding or while they were already on board, in light of the known risks of viral contagion aboard cruise ships and the rapidly- and globally-spreading threat of COVID-19 constitutes a failure to provide even a modicum of care to Plaintiffs and the Class. The continued and repeated choice not to provide passengers with notice of the actual risks facing them demonstrates a willful and conscious disregard for the rights and

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ

-43-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

safety of others and amounts to an extreme departure of what a reasonably careful cruise ship owner and/or operator would do.

187. Moreover, Defendants demonstrated a willful and conscious disregard for the rights and safety of others, and an extreme departure of what a reasonably careful cruise ship owner and/or operator would do in their continued and repeated choices to:  not institute medical screening and examinations for passengers and crew members before the voyage; host large social gatherings and meals; conduct daily turn-down service; and not implement quarantine or social distance protocols until on or around March 22, 2020. These decisions manifest Defendants' utter failure to provide even a modicum of care to Plaintiffs and the Class.

188. Defendants chose to place profits over people, including the safety of their passengers, crew, and the general public in continuing to operate business as usual, despite their knowledge of the actual—potentially lethal—risk to Plaintiffs and the Class.

189. As a direct and proximate result of Defendants' conduct, Plaintiffs were placed at actual, continual risk of immediate, and potentially fatal, physical injury.

190. Indeed, as a direct and proximate result of Defendants' extreme departure from the ordinary standard of care and their failure to meet their duties of care to Plaintiffs and the Class by providing even scant care, Plaintiff Zehner became infected and was diagnosed with COVID-19, and was hospitalized for months, including approximately three weeks that he spent on a ventilator. Plaintiff Lindsay was put in imminent danger of suffering severe and potentially lethal illness.

191. Finally, as a direct and proximate result of Defendants' gross negligence in exposing Plaintiffs and the Class to actual risk of immediate physical injury, Plaintiffs and the Class have suffered emotional distress of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, including, but not limited to, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation and shame. They were traumatized by the fear of developing COVID-19. They were confined on an infected

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ
-44-
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

1   vessel in isolation for over 2 weeks. It is expected that they will continue to suffer and will, in

2   the future, require medical services not of a kind generally accepted as a typical part of daily life.

3                              **THIRD CAUSE OF ACTION**
                    **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

4       192.    Plaintiffs re-allege all allegations in paragraphs 1 through 181 as if alleged fully

5   herein.

6       193.    Defendants HOLLAND and CARNIVAL knew or should have known of the

7   actual, unique risk of viral contagion of COVID-19 aboard cruise ships, and, in light of the

8   situations on ships owned and operated by CARNIVAL—including the Diamond Princess, Ruby

9   Princess, and Grand Princess—prior to the instant voyage on the MS ZAANDAM, Defendants

10  knew or should have known that it was especially dangerous to expose Plaintiffs and the rest of

11  the Class to COVID-19.

12      194.    Nevertheless, Defendants chose to board Plaintiffs and the Class onto the MS

13  ZAANDAM on March 7, 2020 without instituting any procedures for medical screening or

14  examination. Defendants then chose to embark upon the Chile-bound voyage, essentially

15  trapping Plaintiffs and the Class on a vessel infested with COVID-19. Throughout the duration

16  of the trip, Defendants continually and repeatedly:  failed to effectively alert passengers to the

17  possibility of infection aboard the ship until it was too late; and hosted and encouraged

18  participation in large group activities and events that Defendants knew could lead to large-scale

19  infection among the crew and passengers.

20      195.    These choices by Defendants created a dangerous and threatening environment in

21  which Plaintiffs and the Class were forced to live for almost a month, at all times directly at risk

22  of becoming infected with, made ill by, and/or spreading COVID-19.

23      196.    As the direct and proximate result of Defendants' actions and omissions

24  throughout the duration of their voyage aboard the MS ZAANDAM, Plaintiffs and members of

25  the Class were in the "zone of danger," in which they were directly exposed to a potentially-

26

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ                                    -45-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

lethal virus, and placed at immediate risk of—and actually suffered—actual physical harm as a result of their direct and prolonged exposure to COVID-19.  As a result of this exposure, which was directly and proximately caused by Defendants' acts and omissions, Plaintiffs and members of the Class experienced severe psychic injuries, of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, when they were forced to watch first hand as their friends and family members became ill with COVID-19, had a reasonable apprehension that their own safety and well-being were threatened, and continue to expect that they may begin exhibiting symptoms or health complications not yet identified as a result of COVID-19. Plaintiffs suffered physical and emotional injury as the direct and proximate result of Defendants' misconduct.

197.    As a direct and proximate result of Defendants' extreme departure from the ordinary standard of care and their failure to meet their duties of care to Plaintiffs and the Class by providing even scant care, Plaintiffs became infected and were diagnosed with COVID-19.

198.    Finally, as a direct and proximate result of Defendants' gross negligence, Plaintiffs and the Class were exposed to COVID-19 and threatened with serious physical injury. As a result, Plaintiffs and the Class have suffered emotional distress of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, including, but not limited to, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation and shame related to their own risk of contracting COVID-19 and the suffering they witnessed among their fellow passengers who contracted COVID-19. Plaintiffs and members of the class were traumatized by the reasonable apprehension of their family members, friends and fellow passengers developing COVID-19 and by the threat to their own health of becoming infected with the virus or suffering future negative health outcomes or complications related to exposure to or contraction of the virus.

199.    Plaintiffs and Class members were endangered and harmed by Defendants' actions when they were forced into confinement on an infested vessel in isolation. It is expected

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ
-46-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

that Plaintiffs and the Class will continue to suffer and will, in the future, require medical

services not of a kind generally anticipated as a typical part of daily life.

## FOURTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

200.    Plaintiffs re-allege all allegations in all preceding paragraphs as if alleged fully

herein.

201.    CARNIVAL and HOLLAND knew or should have known of the unique

conditions aboard cruise ships that render the risk of viral contagion of COVID-19 aboard cruise

ships especially dangerous and likely, and, based on the situations aboard CARNIVAL-owned

ships the Diamond Princess, Ruby Princes, and Grand Princess, Defendants knew or should have

known that exposure to COVID-19 was threatening to passengers'—including Plaintiffs'—lives

and well-being.

202.    By or before the time of boarding passengers onto the MS ZAANDAM, on March

7, 2020, Defendants knew or should have known of the extreme risks to health and safety—

including the possibility of death—presented by COVID-19.

203.    In light of this knowledge and experience, and particularly given that-, *first*, cruise

ships present an especially heightened risk of contagion and, *second*, that once they have

boarded, passengers have no option of disembarking while the ship remains at sea, exhibited

extreme and outrageous conduct when, *inter alia*, Defendants boarded Plaintiffs and the Class

onto the MS ZAANDAM on March 7, 2020 without taking any effective measures to medically

screen or examine passengers for COVID-19 symptoms.

204.    Defendants exhibited repeated and continued extreme and outrageous conduct

when, prior to March 22, 2020, Defendants failed to: notify Plaintiffs and the Class about the

actual and potential threat of exposure to, infection of, and the possibility of spreading COVID-

19 aboard the ship; failed to advise Plaintiffs and the Class about the possibility and health

benefits of disembarking during the trip, at the vessel's port of call; encouraged Plaintiffs and the

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ
-47-
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN 37201
Tel. 615.313.9000 • Fax 615.313.9965

Class to continue mingling and participating in large group events and functions before March 22, 2020; continued to provide turn down service to passengers before March 22, 2020, despite the fact that the ship's crew members had been exposed to COVID-19; and failed to institute any policies for quarantine, isolation, or social distancing for passengers until March 22, 2020.

205.    The acts and omissions described herein not only failed to protect Plaintiffs from exposure to and contraction of COVID-19, but likely exacerbated the spread of the virus among the passengers, including Plaintiffs and the Class ultimately enlarging the threat and harms to Plaintiffs and the Class.

206.    As a direct and proximate result of Defendants' intentional and reckless behavior and omissions, Plaintiffs and the Class suffered severe emotional distress and physical harm.

207.    Plaintiffs and the Class were forced to watch as their friends and family members became ill with COVID-19, and, all the while, know that their safety and well-being were at extreme risk. Plaintiffs suffered physical and emotional injury as the direct and proximate result of Defendants' misconduct, and Plaintiffs continue to suffer from anxiety and the reasonable apprehension that they may still begin exhibiting symptoms or experience as-yet-unidentified complications due to their exposure to and potential contraction of COVID-19 while aboard the MS ZAANDAM.

208.    As a direct and proximate result of Defendants' extreme departure from the ordinary standard of care and their failure to meet their duties of care to Plaintiffs and the Class by providing even scant care, Plaintiff Zehner became infected and was diagnosed with COVID-19, and was hospitalized for months, approximately three weeks of which were spent on a ventilator. Plaintiff Lindsay was put in imminent risk of suffering severe, potentially lethal, illness.

209.    Finally, as a direct and proximate result of Defendants' gross negligence in exposing Plaintiffs and the Class to COVID-19, Plaintiffs and the Class have suffered emotional distress of the nature and type that reasonable persons would suffer under the circumstances

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ
-48-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN 37201
Tel. 615.313.9000 • Fax 615.313.9965

1   alleged in this Complaint, including, but not limited to, suffering, anguish, fright, horror,

2   nervousness, grief, anxiety, worry, shock, humiliation and shame related to their own exposure to

3   COVID-19 and the suffering they witnessed among their fellow passengers who contracted

4   COVID-19. Plaintiffs and members of the Class were traumatized by the reasonable

5   apprehension of their family members, friends and fellow passengers developing COVID-19 and

6   by the past and ongoing threat to their own health of becoming infected with the virus and

7   potentially suffering from as-yet-unidentified negative health outcomes and complications.

8     210. Plaintiffs and Class members were endangered and harmed by Defendants'

9   actions when they were forced into confinement on an infected vessel in isolation. It is expected

10  that Plaintiffs and the Class will continue to suffer and will, in the future, require medical

11  services not of a kind generally accepted as part of the wear and tear of daily life.

12    211. Throughout the events described in this Complaint, Defendants repeatedly acted

13  with conscious, callous, and/or reckless disregard for the rights, interests, health and safety of

14  their passengers, such that the imposition of punitive damages, under general maritime law

15  and/or all other applicable law, is necessary and appropriate to punish them for their course of

16  conduct, and to deter them and others, and protect the public, from the consequences of similar

17  conduct.

18           **<u>PRAYER FOR RELIEF</u>**

19    WHEREFORE, Plaintiffs, on behalf of themselves, and all others similarly situated, pray

20  for judgment against Defendants, and each of them, as follows:

21    1. An order certifying the proposed Class pursuant to Fed. R. Civ. P. Rule 23(a) and

22  (b)(1), (b)(2), (b)(3) and/or (c)(4), designating Plaintiffs as named representative of the Class and

23  designating the undersigned as Class Counsel;

24    2. An award of damages totaling in excess of Five Million Dollars ($5,000,000.00),

25  inclusive of compensatory damages for Plaintiffs' injuries, including emotional pain and suffering

26  and any other damages allowed by law, in an amount to be proven at trial;

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ     -49-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

3.      An award of the costs of Plaintiffs' and the Class's ongoing medical monitoring and diagnostic examinations required to diagnose, prevent, and/or treat current or future injury related to Plaintiffs' and Class Members' exposure to, illness and disease caused by, and contraction, asymptomatic contraction, and/or potential contraction of COVID-19, in light of the evolving scientific understanding of the full risk and scope of health outcomes related to and / or resulting from the virus.

4.      An injunction requiring Defendants to: disclose to future passengers the nature and rate of risk of communicable disease upon their cruise ships; implement disinfecting and sanitizing procedures on each of their ships in between and during voyages; implement appropriate social distancing and physical distancing protocols to avoid or reduce the transmission of communicable pathogens; disembark and quarantine passengers when Defendants become aware of a heightened risk of communicable disease aboard a ship; and canceling or discontinuing the operation of cruises when Defendants know or should have known of a potential deadly pathogen or similar aboard their ships.

5.      An award of attorneys' fees and costs, as allowed by law;

6.      An award of pre-judgment and post-judgment interest, as provided by law;

7.      Leave to amend this Complaint to conform to the evidence produced at trial; and

8.      For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ

-50-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965

1   Dated: October 30, 2020          TOUSLEY BRAIN STEPHENS PLLC

2                                    By: */s/ Jason T. Dennett*

3                                          Jason T. Dennett, WSBA #30686

4                                    Kim D. Stephens, WSBA #11984
                                     kstephens@tousley.com
5                                    Jason T. Dennett, WSBA #30686
                                     jdennett@tousley.com
6                                    Rebecca L. Solomon, WSBA #51520
                                     1700 Seventh Avenue, Suite 2200
7                                    Seattle, Washington  98101
                                     Telephone:  206.682.5600
8                                    Facsimile:  206.682.2992

9
                                     LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
10                                   Elizabeth J. Cabraser (*pro hac vice*)
                                     ecabraser@lchb.com
11                                   Jonathan D. Selbin (*pro hac vice*)
                                     jselbin@lchb.com
12                                   275 Battery Street, 29th Floor
                                     San Francisco, California  94111-3339
13                                   Telephone:  415.956.1000
                                     Facsimile: 415.956.1008
14
                                     LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
15                                   Mark P. Chalos (*pro hac vice*)
                                     mchalos@lchb.com
16                                   Kenneth S. Byrd (*pro hac vice*)
                                     kbyrd@lchb.com
17                                   222 2nd Avenue South, Suite 1640
                                     Nashville, Tennessee  37201
18                                   Telephone:  615.313.9000
                                     Facsimile:  615.313.9965
19

20                                   BARRETT JOHNSTON MARTIN & GARRISON, LLC
21                                   David W. Garrison (TN No. 24968)
                                     dgarrison@barrettjohnston.com
22                                   Philips Plaza
                                     414 Union Street, Suite 900
23                                   Nashville, Tennessee 37219
                                     Telephone: 615.244.2202
24                                   Facsimile: 615.252.3798

25
                                     *Attorneys for Plaintiff and the Proposed Class*
26

CLASS ACTION COMPLAINT
Case No. 2:20-cv-000982-TSZ                          -51-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue, South, Suite 1640
Nashville, TN  37201
Tel. 615.313.9000 • Fax 615.313.9965